(Hamilton County Common Pleas.)

THE CINCINNATI, COLUMBUS and WOOSTER TURNPIKE COMPANY v. THE CITY OF CINCINNATI.

*Turnpikes—Measure of damages—*
Mainly there are two methods of fixing compensation to be awarded as damage for the appropriation of turnpike property while such property is being actively operated.

First: By the ''direct method'' of determining in detail the present cash value, tangible and intangible, of the property appropriated according to its best use and adaptability.

Secondly: By the ''capitalization method'' of determining the rate of per cent. at which the probable future net annual income of the strip of road appropriated, should be capitalized, and then ascertaining therefrom, the capital as the basis of the value of all the property taken.

----

Charge of the court.
PFLEGER, J.
Gentlemen of the Jury:

The law of Ohio provides that where the limits of a city are extended and a toll house is brought within such limits, or within 80 rods (that is about 1320 feet) thereof, the turnpike company shall remove such toll gate to a point on its road not nearer to such limits than 80 rods, and so much of its road as is included within the limits of such city shall become a public street, and no toll shall thereafter be taken; but compensation shall be made to the turnpike company for the damages it will sustain by reason of such removal of its toll gate and surrender of such part of its road, and if the turnpike company and the city do not agree thereon, the damages shall be ascertained in proceedings which the municipal authorities shall commence to appropriate such property to the use aforesaid, or,

in default of such agreement or the institution of such proceedings, the turnpike company, at any time after the removal of the toll gate may recover the same from the city by civil action. The plaintiff, the Cincinnati, Columbus and Wooster Turnpike Company, under such law brought this action against the city of Cincinnati, and claims that on or about January 1st, 1896, the property lying in the village of Linwood was annexed to the city of Cincinnti, and that this territory included about seven-eighths of a mile of turnpike belonging to the plaintiff company, and extended from the east line of Archer street on the west to the northeast corporation line of the city of Cincinnati as extended, on the east; and claims that on or about October 8th, 1898, in a suit brought by the state of Ohio on the relation of the prosecuting attorney of Hamilton county against said turnpike company in the circuit court of Hamilton county, Ohio, a decree was entered ordering that the plaintiff company be ousted of the right and privilege of taking toll at the gate established between said points, and claims that thereafter, plaintiff was compelled to remove or abandon its toll gate and cease cllecting tolls, and said portion of the turnpike in fact became the property of the city of Cincinnati. Plaintiff claims that no agreement was had with the city authorities to ascertain the compensation to be paid for the loss of said turnpike, no suit was brought by the city of Cincinnati to assess such compensation and in accordance with said law it tenders a deed for such portion of the turnpike property and asks that damages be paid to it as compensation for the value of such turnpike and damages to the residue of its pike beyond the present eastern boundary line of the city, and for its toll house and other property, situated upon and appurtenant thereto as detailed to you by the evidence.

These facts are practically admitted by the city of Cincinnati, except that it denies that there is any damage to the residue, and joins in the prayer that a jury assess reasonable compen-

sation therefor. You are therefore impanelled as jurors to assess such damages.

Your main inquiry is, what is the fair and reasonable cash value on or about October 8th, 1898, of this turnpike property, and its appurtenances, such as toll house, bridge, etc., including the road-bed between the east line of Archer street on the west, and Langdon avenue on the east, (about seven-eighths of a mile) as well as the damage, if any, to the residue of the property. The actual extent of pike so appropriated will be designated by me as "⅞ of a mile" for the purpose of identification. By damage to the residue is meant in addition to the damages caused by the taking of this seven-eighths of a mile of pike, such damages as are shown to have been caused by the taking of such seven-eighths of a mile, and which has affected or impaired the value or proportionate income from the remainder of the pike, running from the present eastern corporation line to Goshen. If you find such damage to exist, the amount so lost should be added to the damage of the seven-eighths of a mile of pike taken. In other words, the total damage should be a fair and reasonable compensation to the turnpike company for being deprived of its property rights so appropriated by the city, preventing the turnpike company from collecting any tolls on this portion of the pike in the future, and the loss of toll, if any, to the residue of the pike. If you find, however, from a preponderance of the evidence that, notwithstanding the taking or cutting off of this seven-eighths of a mile of pike, the turnpike company would not be affected or would not lose any income which will in the future come over this pike, between Langdon avenue, or the present eastern corporation line, and the remainder of its pike to Goshen, then there would be no damage to the residue, and any consideration of damages in that regard should not be included in your estimate. In determining the value to be assessed, all of the property so appropriated can not be definitely ascertained by the ordinary

rules of determining values of other property, that is, by the "market value". You have recourse, therefore, mainly to two methods of estimating such values:

First: By ascertaining in detail and separately the value of the franchise of the turnpike company to do business on this portion of the pike, and its title to the road, whether it be fee simple or easement (or right of way) over such portion; the value of the metal or materials placed on the road bed, including the grading, cutting and filling; the value of the bridge, the toll house and the culvert (if you find the culvert is not now in the city limits, or a portion of it only). This method I will call for brevity sake, the direct method.

Secondly: The other mode I will designate as the capitalization method. That is, to fix the capital investment of this particular seven-eighths of a mile of pike from the net earnings of such portion of the pike. In other words, to capitalize such earnings at such percentage as the permanency of the investment for the future will justify. If the income is likely to last perpetually and forever, then such investment is safer, and the percentage of capitalization would be smaller. If, on the other hand the income may not last forever, or may be interfered with or affected in any way, then the rate of capitalization would be higher, increasing with the danger to its duration or continuance.

We will take up the direct method first.

First: In fixing a value upon these things in detail, you should fix the values as they existed on or about October 8th, 1898, at the time the turnpike company ceased to take toll. These values must always be the cash worth; not the cost, because people may pay for things more or less than they are actually worth. The court has permitted the introduction of testimony of the cost of a thing, but this was only as a guide to the actual worth, or for other reasons, and you should not be misled thereby.

Roadway: Your first inquiry under this head will be, the franchise and right of way in this strip of ground between Archer street and the present east corporation line, without any improvements, metal, grading, toll house, bridge or culvert. Ascertain the dimensions of the roadway; its length and width. There is but little conflict as to its length; there is conflict as to the width of the same. You should find from a preponderance of the evidence what the actual width of the roadway was. If you find from such preponderance of evidence that the turnpike company originally acquired fully sixty feet in width, and held possession of the same for twenty-one years or more, continuously, openly, adversely, and without interruption, then, although it has no deeds for the land, the turnpike company did hold title for that width of ground. This title is called "title by prescription," and can not be interfered with after that lapse of time unless it is abandoned or lost by similar usage or possession for twenty-one year or more, which is continuous, open, notorious and adverse, and without interruption. Merely putting up a fence or planting a hedge for that length of time does not constitute such adverse possession as will confer title on public highways. So mere possession by the adjoining owners may be merely a matter of sufferance, from which rights can not accrue. In other words, if you find from a preponderance of the evidence that the turnpike company originally possessed sixty feet in width, its title can not be interfered with so as to make a less width than sixty feet, unless the possession which was taken by the adjoining proprietors within this sixty feet was with an intention permanently to appropriate such portion by adverse user, inconsistent with the purpose of a road and existent for twenty-one years or more, continuously, exclusively, openly and uninterruptedly against the turnpike company.

Franchise: By the franchise is meant, applicable to this turnpike and to this case, the right or privilege granted by the state to acquire and hold property, improve the same for

travel and for turnpike purposes, and collect tolls under its charter from the state, and under the state laws If you find from the evidence that the state of Ohio, or the laws of the state, gave this turnpike company the right to hold property in fee simple, as well as the easement or right of way, then it would have that power, but whether it did in fact so hold it, depends upon the agreements, conduct and acts between itself and the adjoining property holders.

Fee Simple: Fee simple title is property in its highest degree, or largest estate, without any restriction or limitation as to its disposition or the duration of the time of its holding, and without any incumbrance as to lease or right of way.

Easement: An easement is distinguished from the fee simple title as an interest in land or a right or privilege in or upon the land of another. Applicable to this case, a right of way is an easement: that is, it is a mere right to pass over another's land for a definite or an indefinite period. It is also called an intangible interest; that is, an interest in law which is not susceptible to the touch. Both a fee simple title and an easement or right of way may be acquired by prescription. By prescription is meant, not a grant by will or deed or instrument in writing, but title by long continued use and possession such as twenty one years or over, which is exclusive, adverse, open and without interruption. To illustrate. For example: If you owned a vacant lot in fee simple and permitted me to occupy and possess this lot for all purposes of ownership for twenty-one years or more, continuously, exclusively, adversely, openly and without interruption, I would thereupon own this land in fee simple by prescription, and you would have lost your title entirely. So may an easement or right of way be acquired. To illustrate: If I own a lot adjoining yours, and you permit me knowingly and without paying you a compensation therefor, to walk and drive over your lot by a certain road for more than twenty-one years continuously, openly, adversely and without interruption, I would then have acquired an easement or right of way to walk and drive over that particular road forever.

If you find, therefore, by a preponderance of the evidence, that the turnpike company acquired this strip of land by prescription and used the same for all purposes such as an owner generally would, then it would have acquired a fee simple title to it, and it would be entitled to have the value of the fee simple title paid for. If, however, you find from a preponderance of the evidence, that the turnpike company did not use and occupy it for all purposes as an owner generally would, and you find that it took this strip of ground, and used it only for turnpike purposes, then it would only have a title by prescription for turnpike purposes, and the company should be paid what this property is worth for its right of way or easement only.

A corporation has only such powers to acquire and hold real estate as its charter and the laws give it. If you find, therefore, that the charter given the plaintiff company by the state permitted it to acquire real estate in fee simple or for a lesser estate, but that it restricted the object of its formation solely to turnpike purposes, (unless it acquired the strip of turnpike property in question by a fee simple title, by prescription or otherwise) its title thereto would be only for turnpike purposes, or an easement or right of way therein, provided it obtained the same by long continued usage as a turnpike as heretofore described. If it obtained a title for turnpike purposes, then it can not convey to the city any greater title, and can not be compensated except for the easement or right of way therein, and the reversionary interest of the fee simple title would remain in the adjoining property holders; and whether such interest of the property holders is remote or substantial is a question of fact to be determined by the jury. In that event the compensation to the turnpike company can only be on the basis of an easement.

To throw light on this question, tes -

timony has been allowed to be given as to the nature of the occupation of the road by the turnpike company, how the adjoining property holders regarded the same and acted towards the turnpike company, and whether or not such property holders paid taxes on their property to the middle of the pike, and whether or not the turnpike company also paid taxes thereon.

After you have ascertained the length and width of the strip of land actually owned by the turnpike company, and the nature of its title, whether in fee simple or for turnpike purposes only, you will then place a value upon it based upon the testimony produced before you, what it is worth generally for any and all uses for which it may be suitable, and indeed for the most available purposes for which it could be used. If its most available purpose was for a turnpike, then the reasonable value of such purpose should govern. Or if it is adaptable for the purpose for which it has been taken by the city, the jury are permitted to take this into consideration in arriving at its value. In qualifying a witness or testing his qualification to state values, testimony has been given tending to show value of town lots adjoining the pike. These values for town lots should not be considered by the jury as fixing the value of this strip of ground except to test the qualification of the witness or to show the situation of such strip with reference to town lots, unless the jury should find that it was possible to subdivide this strip of ground in controversy into town lots and that the turnpike company owned the same in fee simple.

Second. You will then ascertain the quantity of metal put upon the road; that is, the quantity of gravel and stone, the average depth and width, and the amount of grading of fills and cuts, and place a reasonable figure upon them.

Third. You will then ascertain the reasonable value of the bridge crossing Duck creek, in its present condition, or as it existed on October 8, 1898, and adapted as it is for the most available purpose. You should take into consideration the use to which it has been put and for which it was designed, and the amount of wear and tear to which it has been subjected. If it is better adapted for turnpike purposes than anything else, then such value should govern: not the cost, but the value of it, together with the reasonable value of the masonry and abutments, as they existed on or about October 8, 1898.

Fourth. You will then ascertain separately the value of the toll house. This is done, because where a building or other structure which is situated partly on the land sought to be appropriated, and partly upon the adjoining land, and which can not be divided without manifest injury, the jury in assessing compensation should make a separate estimate of the value of the structure, permitting the owner of the structure or toll house at his option to retain the ownership of the same and remove it even after the verdict of the jury, or accept the value thereof.

Fifth. You will next ascertain whether the culvert at or near Orchard street is within the lines of this seven-eighths of a mile of pike or whether it now belongs to the city by virtue of its acquiring it from the street railroad company. If it is the property of the city, then of course no value should be placed upon it or included in your estimate of damages, inasmuch as the turnpike company would then have no title thereto. If it is wholly within the seven-eighths of a mile, a reasonable value from the testimony should be placed upon it, and included in your estimate. If you find that a part of it only is within the seven-eighths of a mile of the road, then that portion of it which lies within the seven-eighths of a mile should be valued from the testimony and included in your estimate of damages.

When this is done, you will then have placed the value upon all the property appropriated by the city under the direct method heretofore indicated. If you find you have thus ascertained its fair and reasonable value,

it may be accepted by the jury without considering damages under the capitalization theory.

In order that the jury fix such fair and reasonable value, it may and should consider the testimony on the capitalization theory, and compare such value thus ascertained with the value ascertained by the other method. Of course, these two estimates must not be added or taken together, as they are merely different modes of arriving at the same conclusion.

Capitalization method. As heretofore explained to you, in order to determine the capital investment of the turnpike company in this portion of the pike, it will be necessary for you to ascertain as nearly as possible the future net income on this seven eighths of a mile of pike. To do that, you can first ascertain the net average income of the whole road at the present time. Secondly, the average future net income of the entire road as nearly as possible. Third, the average future net income on this particular seven-eighths portion herein appropriated. To aid you on this branch, evidence has been introduced as to the present rates and amounts of tolls collected on the whole road at gate number 2, the Duck creek gate, which is on the seven-eighths mile of pike, and several other toll gates during the last ten years; also as to the expense incident to the management of the business of the company during that time. In estimating the expense of the management, you should ascertain, what, under the circumstances would be a fair and reasonable sum to allow for repairs of the road, and its bridges and appurtenances in order that its property may retain its proper earning power for the future. If the road, bridges and appurtenances were not kept in proper condition and repair, its patronage would decrease, and its earning power become less. Or, on the other hand, too much might be put in repairs or betterments upon this road and bridges and appurtenances, and leave little for dividends to the stockholders, and this would not allow proper income for the capital invested. Your object therefore,

should be to fix a fair and reasonable average sum for such repairs, betterments and expenses of management of the road, annually, to keep the property in proper condition. This expense for repairs, betterments and expense of the management should be fixed with reference to the future, taking into consideration the condition of this portion of the turnpike, whether good or bad.

You will next turn your attention to the income of the road. This income of course is only of tolls to be collected. In no event should you consider as part of the income, from which the expense should be deducted, anything received from stocks, bonds or other investments of its money—made by the turn pike company. They can not enter into your calculation for the purposes of this case. If the toll income which has been testified to as having been received during the last ten years for the whole 16 or 17 miles of turnpike, or for this particular strip of seven-eights of a mile, would be the income in the future, there would not be much difficulty in arriving at a reasonable conclusion. There is no certainty, however that the net income in the future will be the same as in the past. It may be more or less, depending upon a variety of circumstances. The future income may depend upon the character and number of vehicles using the pike; the rates of tolls, which may be changed by law or reduced by other circumstances; the danger, if any, of another road or street having been or being built in the future near or along side the portion of the road in qestion, so as to parallel it, or by new cross streets or cross roads which could be made in the future to connect with this part of the turnpike, and serve to compete with it in travel, or give facilities for persons traveling it to avoid paying tolls. You should also consider whether the revenue of the pike will thereby be decreased or the road become entirely valueless, because the receipts of such road's toll would not justify the expense of keeping the turnpike in repair. Also whether this part of the road is subject to floods or

overflows, and if so, how often, and what effect they have on the roads. In determining this question you should take into consideration what has been said by the witnesses about Delta or Columbian avenue, its grade, width, condition and proximity to the city as compared with this seven-eighths of a mile of the Wooster turnpike; whether or not it does now or would in the future offer a more convenient or better route than the seven-eighths of a mile, or take away any or all travel along this portion of the Wooster turnpike; also the testimony as to whether or not a practicable road could be and would be built in the future in the several locations described to you, viz: adjoining the hill and north of the railroad tracks, and over the ridge lying south of the Wooster pike and any other road which may have been indicated to you, and what effect, if any, these would have upon the value of this seven-eighths of a mile of the Wooster turnpike road. If, in your opinion it would have no effect, then there should be no decrease in the receipts of toll on that account. If, however, in the judgment of the jury either of such future road likely to be built would have such an effect, then a proper reduction should be made from the tolls for the future. If the jury believe that such parallel roads in the future might or would be built, and take away all of the tolls of this seven-eighths of a mile of the Wooster turnpike, or to so large an extent that it would no longer be profitable to run this seven-eighths of a mile as a turnpike, then of course, on that basis it would have little or no value, as the jury may determine.

Having arrived at an agreement as to what the net annual income from tolls for the future would probably be to operate the whole road, you will next inquire what proportion of the probable net annual income is applicable to this particular seven-eighths of a mile in controversy. For your guidance testimony has been offered tending to show what the past receipts were from gate number two, or the Duck creek gate. Do these receipts really represent the receipts of this particular piece of road that has been taken, or do they represent a much larger stretch of road? If you find that the tolls taken in at this gate include tolls that belong properly to a part of the turnpike east of the present boundary line of the city, or what is known as Langdon avenue, then you should seek to ascertain what proportion of the receipts are applicable to the seven-eighths of a mile. You should take into consideration what amount or proportion of the travel came down the Red Bank Road from Madisonville, Loveland, and beyond what portion came from Plainville and other eastern points, and the character of this travel. If thereupon, the jury can ascertain what is the proper amount of annual expense to be charged to this particular seven-eighths of a mile, it will then have by deduction the net annual income of this particular seven-eighths of a mile in controversy, and the per cent. of capitalization can be applied. If, however, the jury is not able to ascertain the net annual income of this portion of the road for the future by this method, it may be able to reach it more definitely by obtaining the net annual income for the future for the whole road running to Goshen, and from it ascertain, from the length of the road or in some other manner, what proportionate income or expense should be given this particular seven-eighths of a mile under consideration, as compared to the whole road. Which ever manner is more definite in the minds of the jury should be accepted. Having agreed upon this figure as representing the net annual income for the future of this particular seven-eighths of a mile, you have then ascertained the basis of determining the compensation to be allowed, excepting only the rate of per cent at which such income should be capitalized.

Percent: This rate of per cent. has been testified to by witnesses as all the way from four or five per cent. to ten or twelve per cent. in a hundred. The reasonable rate is the one at which such net income should be capitalized. As stated to you before, this

rate decreased as the probability of permanency of the investment increased, and the rate of per cent. increased as the probability of the permanency of the investment decreased. For the purpose of illustration: suppose the net future average annual income of a turnpike were one thousand dollars, and its investment were permanent; that is, to say, there would be no danger of its being paralleled or intersected by streets for all time to come, or would not be affected by any other future conditions, and for example, we will say that five per cent. was a fair rate of capitalization; this five per cent. means one-fifth of a hundred at which such income should be capitalized and such income represented twenty per cent. of the capital invested. You multiply the net income of $1,000 by 20 which would make $20,000, and would make such a pike worth on the capitalization theory, under those circumstances, twenty thousand dollars. Now, suppose, however, and for further illustration, that the one thousand dollars was a fair net future average income, but that because of the danger of a parallel road or cross or intersecting streets, or for other reasons, the road or pike would not be likely to hold out or exist as a paying institution for any great length of time and investors would be uncertain about its value, and suppose, for illustration that it were said that ten per cent., because of the additional risk taken, would be a fair rate of capitalization; on this basis the pike would only be worth ten thousand dollars. All these questions as to the net income and expense of the road, and as to the future dangers to the pike by flood or othrewise, or that the pike might be paralleled or intersected by cross streets, and that the tolls might thereby be reduced, or on the other hand, that this pike could not successfully or practically be paralleled or intersected and that the increase in population might increase the prospects of the road for the future instead of decreasing it, and the duration of time as to how long this investment is likely to last and the rate of interest to be ap-

plied to it, are all matters of fact for the jury to determine from all the circumstances of the case. So are also questions whether tolls may or may not be changed by legislative enactment in the future or in order to meet competition; the dangers, if any of forfeiture or abandonment on the part of the turnpike company; or any danger of its franchise being affected by non-payment of debts and the subjection of its property to execution.

After ascertaining the sum at which this seven-eighths of a mile should be capitalized, you should then add thereto any damage to the residue of the turnpike as before explained to you, provided you find there is such damage to the residue. Having ascertained its value then by two methods, first by the direct method and also by the capitalization method, you must adopt one or the other, or fix a sum relative to either of these estimates, but you can not add them together, nor take any part of one, and add that to the other. They are separate and distinct methods or modes of arriving at the same conclusion.

Some testimony has been admitted tending to prove the value of a new toll house to be erected on the turnpike about 80 rods east of Langdon avenue or the present eastern corporation line of the city in order that toll between such eastern boundary line and the next toll gate might not be lost. You will not include in your estimate any amount for the erection or value of a new toll house as that is not a proper item of expense.

Burden of proof: The burden of proof is upon the plaintiff to establish by a fair preponderance of the evidence the extent and nature of its title to the turnpike property so appropriated, and the reasonable value thereof. By a preponderance of evidence is meant the "weight of the evidence," and this expression does not necessarily mean that one side has more witnesses than the other. It simply means that if after weighing the testimony of all the witnesses with reference to their credibility, their qualification as experts, their familiarity with subjects testified about, their

exactness of memory, their conduct in testifying, their interest or lack of interest in the suit, and all the circumstances surrounding their testimony, the evidence of one side outweighs that of the other then such side is said to have the weight of evidence. The jury are the sole judges of the weight of the testimony and the credibility of the witnesses. The jury has a right to determine from the appearance of the witness on the stand, his manner, conduct and demeanor while testifying, his apparent candor and frankness, his apparent intelligence or lack of intelligence, his qualification to testify as an expert, his familiarity and experience with values or the subjects upon which he testifies, his memory or lack of memory, his interest or lack of interest, if any in the result of the suit, his relationship, business or otherwise to the parties, his temper, feeling or bias, if any, and from all these and the other circumstances determine which witness is the more worthy of credit and to give credit accordingly.

In determining the net cash value of this turnpike, you are also to take into consideration, and give such weight as you think proper, and as throwing light on the question of value, any admissions on the part of the turnpike company, or its authorized officer or officers of the tax value of this particular portion of the road; what relation did it bear to its actual value, and under what circumstances was this tax valuation made; the sales of the shares of the capital stock of the turnpike company, and also what sales of any portion of this pike were previously made, and at what prices, and under what circumstances, and what was the condition of that portion of the pike as compared to this seven-eighths of a mile: also any voluntary admissions of the company or its authorized agents as to offers to sell this particular seven-eighths of a mile of pike, and under what circumstances and conditions, also what dividends did the turnpike company pay during the last ten years, and what light do such dividends throw on the value of the property in question, what reduc-

tions in toll, if any, the company has made and whether the tolls are apt to be reduced or increased in the future. From all these fact sand circumstances, and all the other evidence in the case determine where the preponderance of testimony lies.

After you have fixed the full compensation to which the plaintiff is entitled you will add 6 per cent. interest from October 8, 1898, to January 2, 1899, the first day of this term. A form of verdict will be given you, and you can insert in one amount, the principal and interest. This verdict must be signed first by your foreman and then by each member of the jury.

In order to assist the jury the court has prepared a schedule of the methods hereinbefore described to you which you can take to your room as a guide in arriving at your verdict. This schedule is as follows:

### Schedule.

The valuation specified must be the present cash worth of the property of the plaintiff herein appropriated, according to its best use and adaptability

### I.—Direct Method.

1. Ascertain the dimensions of the roadway; its length and width.

(a). The extent of the plaintiff's franchise.

(b). The nature of the estate in the road; whether fee simple or mere easement (right of way).

(c). The cash value of the same irrespective of any improvements, such as metal, bridges, culverts, toll houses, etc.

(2). Ascertain the length, width and depth of the metal (that is, the gravel, stone and other material and the grading).

(a). The cash value of the same in its present condition.

3. Ascertain the present conditions and dimensions of the bridge over Deer creek, its masonry, foundations and abutments.

(a). The cash value of same in present condition.

4. Ascertain the size, condition and cash value of the toll house.

5. Ascertain whether the culvert is within the limits of the road appro-

priated. If so, ascertain its size, condition and cash value of same.

(The addition of these five items will determine the total net value of the property appropriated by one method).

II.—Capitalization Method.

1. Ascertain the present gross annual receipts from tolls of the entire road.

2. Ascertain the present gross annual expenses of the entire road including the management thereof.

3. Ascertain the present net annual income from tolls of the entire road.

4. Ascertain the present net annual income from tolls of the strip in question.

(a). If the toll receipts of the toll gate on the strip in question include only the toll for this strip, then the receipts for this strip may be taken as the gross income therefor. If not, then a reasonable estimate of the proportionate income of tolls, under the circumstances, should be fixed.

(b). Deduct from such net annual income of toll the reasonable proportionate expense of the road and management of this strip.

5. Will this net annual income be apt to increase in the future because of increase in population? If so, make a proper increase under all the probable future circumstances.

6. Will this net annual income be apt to decrease in the future because of present or future parallel roads, cross roads, streets or shunpikes, floods or reduction of tolls? If so, make a proper reduction under all the probable future circumstances.

7. Ascertain the rate per cent. at which such probable future annual net income of this strip of road should be capitalized, taking into consideration the probability of the permanency of the title of the plaintiff company, such as increase or decrease of population, future parallel roads, streets, cross roads or floods. (The sum so realized will determine by the capitalization method the total net value of the property appropriated).

Compare the results of these two methods. Do not add them together. Take into consideration such other facts as the dividends declared by the company; sales of its capital stock in the market, if any; sales of other portions of this pike; admissions of the company as to its value; its taxes paid, and all other facts and circumstances given you in the charges of the court.

Theodore Horstman, for Plaintiff.

Ellis G. Kinkead, Wade H. Ellis, John O. Campbell, for the City of Cincinnati.